# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# WESTERN DIVISION

**LEODIS RANDLE**                                                                                      **PLAINTIFF**

**V.**                               **CASE NO. 4:18-CV-188-BRW-BD**

**D. MUSSADIQ,** *et al*.                                                                         **DEFENDANTS**

## RECOMMENDED DISPOSITION

**I.   Procedure for Filing Objections:**

This Recommended Disposition ("Recommendation") has been sent to Judge Billy Roy Wilson. Any party may file written objections to this Recommendation. Objections should be specific and should include the factual or legal basis for the objection. To be considered, objections must be received in the office of the Court Clerk within 14 days of this Recommendation.

If no objections are filed, Judge Wilson can adopt this Recommendation without independently reviewing the record. By not objecting, parties may waive any right to appeal questions of fact.

**II.   Background:**

Leodis Randle, an inmate at the Pulaski County Detention Facility ("Detention Facility"), filed this lawsuit without the help of a lawyer under 42 U.S.C. § 1983. (Docket entry #1) Because of Mr. Randle's litigation history, he was not eligible to proceed *in forma pauperis* ("IFP") absent allegations of imminent danger of serious physical injury.

The Court, however, determined that Mr. Randle should be allowed proceed under the imminent-danger exception to the so-called "three strikes" rule. (#37)

Based on allegations in his fourth amended complaint, Mr. Randle stated deliberate-indifference claims against Defendants Jackson, Hillard, and Harris (the "Medical Defendants"). In addition, he stated excessive-force claims against Defendants Freeman, Cass, Watson, Whitworth, Jenkins, and Newburn. Finally, Mr. Randle stated failure-to-protect claims against Defendants Holladay, Mussadiq, Nelson, and McKanna.

Because Mr. Randle is proceeding under the imminent danger exception to the "three strikes" rule, he is limited to pursuing those claims that directly relate to the alleged imminent danger. *McAlphin v. Toney*, 375 F.3d 753, 755 (8th Cir. 2004) (if an "inmate is granted leave to proceed i.f.p. under the 'imminent danger' exception, the i.f.p. action must be limited to imminent danger claims"). Furthermore, his claims are limited to those that involve a risk of *continuing* or *future* injury and not to claims seeking "a remedy for past misconduct." *Martin v. Shelton,* 319 F.3d 1048, 1050 (8th Cir. 2003) (emphasis in original). Accordingly, the Court previously dismissed Mr. Randle's remaining claims. (#58)

All Defendants have now moved for summary judgment on Mr. Randle's claims against them. (#176, #177) Mr. Randle has responded to the Defendants' motions and Defendants Holladay, Mussadiq, Nelson, McKanna, Freeman, Newburn, Jenkins, Whitworth, Watson, and Cass (the "County Defendants") have replied to Mr. Randle's response. (#186, #188)

### III. <u>Discussion:</u>

A. Standard

In a summary judgment, the Court rules on the case without a trial. A party is entitled to summary judgment if—but only if—the evidence shows that there is no genuine dispute about any fact important to the outcome of the case. See FED. R. CIV. P. 56 and *Odom v. Kaizer*, 864 F.3d 920, 921 (8th Cir. 2017).

B. Medical Defendants' Motion for Summary Judgment

1. Undisputed Factual Evidence

On January 30, 2018, nurse Melissa Grimes (not a party to this lawsuit) conducted Mr. Randle's medical screening at intake. (#177-1 at p.1) At that time, Mr. Randle stated that he did not suffer from seizures and that he did not suffer from any mental health conditions. (*Id*. at p.3) In addition, Mr. Randle told Ms. Grimes that he was not taking any medication to treat mental health conditions. (*Id*. at pp.4-5) Nurse Grimes concluded that Mr. Randle had "Stable MH Condition" and recommended that he be housed in general population. (*Id*. at p.7)

On February 12th, Mr. Randle was examined by Defendant Jackson based on a "Medical Staff Request." (*Id*. at p.9) At that time, Mr. Randle notified Defendant Jackson that he was undergoing mental health treatment for depression and that he had a prescription for Depakote. (*Id*. at p.10) Mr. Randle, however, also "denied any concerns and reported they [sic] are coping adequately with incarceration at this time." (*Id*.)

Defendant Jackson conducted a mental health assessment of Mr. Randle and concluded that he could stay "in unit." (*Id*. at p.12) He advised Mr. Randle "to submit [a]

3

request for follow up as needed." (*Id.*)

On March 2nd, Quelinda Tillman (not a party to this lawsuit) assessed Mr. Randle after Mr. Randle reported that his right shoulder had been injured during an altercation on March 1st. (*Id.*) Ms. Tilman noted that Mr. Randle was to be examined by the provider that day and noted that an x-ray examination of Mr. Randle's shoulder should be ordered "stat." (*Id.*)

On the same day, the medical provider, Kendra Roberts (not a party to this lawsuit), examined Mr. Randle. (#177-2 at p.1) Ms. Roberts noted "edema, deformity to right shoulder, elbow, [and] wrist." (*Id.* at p.3) She diagnosed Mr. Randle with "acute injury to right shoulder, elbow, wrist, [and] hand." (*Id.*) Ms. Roberts ordered an x-ray examination of Mr. Randle's "right shoulder, right elbow, and wrist/hand." (*Id.*) She also ordered ibuprofen, as well as a sling with an ice pack for Mr. Randle. (*Id.* at pp.3-4)

On March 7th, nurse Kimberly Harrison (not a party to this lawsuit) examined Mr. Randle. (#177-1 at p.13) At that time, Mr. Randle complained that he suffered from seizures and that he had previously been prescribed Depakote. (*Id.*) Nurse Harrison noted that Mr. Randle had stated that he was not taking any medication at intake. (*Id.*) At that encounter, Nurse Harrison told Mr. Randle that his x-ray examination results were "normal." (*Id.* at pp.13-14) She placed Mr. Randle on the list to be seen in chronic care for "possible assessment of seizures." (*Id.* at p.14)

On the same day, nursing manager Jacob Mitchell (not a party to this lawsuit) obtained a telephone order from Ms. Roberts to provide Mr. Randle Divalproex (Depakote) based on Mr. Randle's seizure history during previous incarcerations. (*Id.* at

4

p.13) In addition, Ms. Roberts ordered that Mr. Randle be moved to a bottom bunk. (*Id.*)

The next day, Ms. Tillman examined Mr. Randle based on his complaints of a broken wrist. (*Id.* at p.14) She noted that Mr. Randle was "up ambulating without any difficulty at this time and does not complain of having any pain at this time." (*Id.*)

On March 13th, Ms. Roberts examined Mr. Randle. (#177-2 at pp.4-6) She recommended that Mr. Randle continue taking Depakote and ordered a routine mental health referral. Initially, Mr. Randle consistently took his medication, but beginning on March 17th, he began to refuse to take Depakote as prescribed. (#177-4 at pp.2-9) On March 21st, Mr. Randle indicated that he would no longer take Depakote because he believed that the medication was causing him to lose his hair. (#177-1 at p.16)

On April 1st, Dr. Jeremy Thompson conducted Mr. Randle's mental health review. (*Id.* at p.18) He noted that Mr. Randle stated that he was "doing very well and would prefer to not take any medications at this facility." (*Id.*) Dr. Thompson concluded that Mr. Randle's symptoms had a "minor impact on [his] ability to function satisfactorily in the current setting." (*Id.*) He recommended that Mr. Randle receive a psychiatry follow-up in 90 days. (*Id.*)

On April 5th, mental health professional Marita Dowdy (not a party to this lawsuit) examined Mr. Randle based on his complaints that he was not being provided adequate mental health treatment. (*Id.* at p.21) Ms. Dowdy reminded Mr. Randle that had just been seen by Dr. Thompson and that he was being seen twice weekly by mental health staff members. (*Id.*)

On April 10th, Mr. Randle requested that he be evaluated by a psychiatrist based on his failure to receive medication. (*Id*. at p.23) At that time, Breesha Donahue (not a party to this lawsuit) explained to Mr. Randle that his medication was discontinued when he refused to speak with the psychiatrist. (*Id*. at pp.23-24)

On May 10th, Mr. Randle placed a sick-call request, again complaining that he was not being provided medication. (*Id*. at p.29) Ms. Donahue reminded Mr. Randle that he was not receiving medication "per his own request." (*Id*. at p.30)

On May 25th, Mr. Randle placed another sick-call request asking to be examined by a doctor. (*Id*. at p.34) When Ms. Roberts examined Mr. Randle, he explained that his prescribed medication sometimes made him sick. At that time, Ms. Roberts adjusted his prescribed medication, and Mr. Randle began taking his medication again. (#177-4 at pp.8-9)

2. Deliberate Indifference

A public official's "deliberate indifference to a prisoner's serious illness or injury" violates the Eighth Amendment ban on cruel punishment. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976).[1] "Deliberate indifference" is evidenced, however, only when "the official knows of and disregards an excessive risk to inmate health or safety; the official must

---

[1] Mr. Randle's inadequate medical care claims are analyzed under the Fourteenth Amendment's Due Process Clause, instead of the Eighth Amendment's Cruel and Unusual Punishment Clause, because he was a pretrial detainee (and not a convicted prisoner) while he was at the Detention Facility. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). However, the Eighth Circuit applies the same deliberate-indifference standard whether claims are technically brought under the Fourteenth or Eighth Amendment. *See Vaughn v. Greene County, Ark.*, 438 F.3d 845, 850 (8th Cir. 2006).

both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837. Negligence, even gross negligence, is insufficient to establish liability. *Fourte v. Faulkner County*, 746 F.3d 384, 387 (8th Cir. 2014) (quoting *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)).

Moreover, mere disagreement with treatment decisions is not a basis to hold defendants liable. *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010). Stated another way, "[i]n the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that 'he did not feel' he received adequate treatment." *Dulany v. Carnahan*, 132 F.3d 1234, 1240 (8th Cir. 1997).

Here, Mr. Randle's medical records show that he was consistently examined and provided prescription medication during his incarceration at the Detention Facility. Mr. Randle has not come forward with any evidence contradicting that presented by Defendants. Based on the undisputed evidence in this record, there is insufficient evidence to support Mr. Randle's deliberate-indifference claims. To the contrary, his medical needs were promptly addressed each time he notified medical personnel of a problem. The only delays that Mr. Randle experienced in receiving prescription medication were self-imposed. These undisputed facts fall short of demonstrating negligence, much less deliberate indifference. Accordingly, the Medical Defendants are entitled to judgment as a matter of law.

C. County Defendants' Motion for Summary Judgment

1. Undisputed Factual Evidence

On February 24, 2018, Mr. Randle filed a grievance alleging that Deputy Mathis had retaliated against him. Mr. Randle attached an affidavit to his grievance complaining that Defendant McKanna had placed him in handcuffs, then pulled his arm through the feed slot, thereby bruising his arm. (#180-1 at p.37) On March 8, 2018, Sergeant Brawley responded that the matter was being investigated. (*Id*. at p.39) Although the date of the alleged incident is not clear, it is undisputed that Mr. Randle did not request any medical treatment for any February 2018 incidents; nor did he report any injury to medical staff in February 2018. (#177-1)

On March 1st, Mr. Randle submitted another grievance complaining that Defendant Newburn had injured him when he "twisted and bent" his arm. (*Id*. at p.40) On March 3rd, Mr. Randle submitted another grievance regarding the same incident. (#180-1 at p.44)

In support of their motion for summary judgment, the County Defendants attach a video recording of the March 1st incident. (Exhibit 1-7) The video footage of the incident shows Mr. Randle with his arm out of the food port of his cell for an unknown amount of time. After a time, during which it appears that Mr. Randle is told many times to remove his arm from the food port, Defendant Newburn calmly removes Mr. Randle's arm from the food port.[2]

---

[2] It is undisputed that, on March 2, 2018, Mr. Randle was examined by medical personnel for complaints of a shoulder injury. As noted, he was given ibuprofen and a sling with an

On March 8th, Mr. Randle submitted two other grievances complaining that Defendants McKanna and Whitworth had again pulled his arm through the food port of his cell door causing injury to his arm. (#180-1 at pp.51, 54) Initially, Mr. Randle told Detention Facility staff that he had a broken wrist. Later that day, however, he told Ms. Tillman that there was "nothing wrong with his wrist." (*Id*. at p.49)

The County Defendants also attach a video recording of the March 8th incident to their motion. (Exhibit 1-12) That video recording shows Defendants McKanna and Whitworth working together to remove Mr. Randle's arm from his food port. Although it is unclear what occurred immediately after Mr. Randle's hand was removed from the food port, the removal of his arm from the food port occurred with little apparent force.

Mr. Randle also complains that he was placed in the restraint chair on March 8th. It is undisputed that, on that date, he was indeed placed in a restraint chair for approximately one hour after he attempted to cover the camera in his cell multiple times, after repeatedly being ordered not to do so. (#180-1 at p.50) When Mr. Randle was released from the restraint chair, he was assessed by medical staff. (*Id*.) No marks or abrasions were noted on his arm.[3] (*Id*.)

On March 19th, Mr. Randle mailed a letter to Sheriff Holladay alleging that he had been sexually harassed by Defendant Mussadiq. (*Id*. at p.56) Detention Facility staff

---

ice pack. (#180-1 at p.46) Mr. Randle's x-ray results following that incident were "normal." (*Id*. at p.48)

[3] In his fourth amended complaint, Mr. Randle also alleges that, on an unspecified date, he was placed in an "iron chair" for fifteen hours. (#49 at p.6) There is no evidence that any such incident ever occurred.

investigated Mr. Randle's allegations. As part of the investigation, Detention Facility staff investigated Mr. Randle's allegations regarding the March 1st and March 8th incidents. (*Id*. at pp.63-65) Lieutenant Shephard reviewed all incident reports and video footage related to Mr. Randle's allegations and concluded that force was not used during the incidents at issue. (*Id*. at p.67)

On April 6th, Detention Facility officers escorted Mr. Randle to his cell in full restraints. (*Id*. at p.80) After officers left his cell, Mr. Randle failed to walk to the cell door so that officers could remove his handcuffs. (*Id*.) Officers then opened the door to the cell, and Defendant Jenkins grabbed the center of the handcuffs and walked Mr. Randle to the food port. (*Id*.) Defendant Cass grabbed the handcuffs, and Mr. Randle stated "I'll give you a reason to put me on full restraints!" while grabbing Defendant Cass's hand. (*Id*.) At that time, Defendant Cass struck the top of Mr. Randle's hand to force him to break his hold. (*Id*.) Mr. Randle let go of Defendant Cass's hand, and the handcuffs were removed. (*Id*.)

The County Defendants attach the video footage of the April 6th incident. (Exhibit 1-17) That video recording shows Mr. Randle acting verbally aggressive with Detention Facility staff members. Although the video shows Defendant Jenkins grabbing Mr. Randle's handcuffs and walking him to the front of the cell, the video does not capture what occurred after Defendant Jenkins left Mr. Randle's cell.[4]

---

[4] Mr. Randle alleges that Defendant Freeman choked him on April 7, 2018, but there is no use of force report for that date. Rather, Defendant Freeman investigated the incident that occurred on April 5th. (#180-1 at pp.80-81) Based on a review of Mr. Randle's

10

2. Individual Capacity Claims

Qualified immunity protects government officials from liability for monetary damages in a § 1983 action unless their conduct violated a plaintiff's clearly established federal statutory or constitutional rights. *Ashcroft v. Al-Kidd*, 563 U.S. 731, 736 (2011); *Saylor v. Nebraska*, 812 F.3d 637, 643 (8th Cir. 2016). Conversely, qualified immunity does not shield government officials from liability if the facts alleged show the violation of a constitutional right that was clearly established at the time of the incident giving rise to the claim. *Dadd v. Anoka Cnty.*, 827 F.3d 749, 754-55 (8th Cir. 2016); *Hager v. Ark. Dept. of Health*, 735 F.3d 1009, 1012 (8th Cir. 2013).

    a. Excessive Force Claim

The constitutional standard applicable in an excessive force case depends upon the plaintiff's status. *Andrews v. Neer*, 253 F.3d 1052, 1060-61 (8th Cir. 2001). Because the State may not punish arrestees or pretrial detainees, excessive force claims brought by arrestees (under the Fourth Amendment) or pretrial detainees (under the Fourteenth Amendment) are analyzed under an "objective reasonableness" standard. *Id.* (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). To prevail on his excessive force claim, therefore, Mr. Randle must show that Defendants Freeman, Cass, Watson, Whitworth, Jenkins, and Newburn purposely or knowingly used objectively unreasonable force. *Kingsley v. Hendrickson*, __U.S.__, 135 S. Ct. 2466, 2473 (2015).

---

medical records, he did not report any such incident to medical staff; nor did he request medical treatment for any injury on April 7, 2018.

Whether the application of force was reasonable turns on the facts and circumstances of each particular case, and the officer's action are assessed from the perspective of a reasonable officer and what the officer would have known at the time of the incident. *Ryan v. Armstrong*, 850 F.3d 419, 427 (8th Cir. 2017). Several factors are relevant in assessing whether the force used was objectively reasonable: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. *Id.*

Here, based on the incident reports and video footage in the record, it is apparent that Mr. Randle was not obeying orders in at least three of the incidents where he alleges excessive force. Furthermore, the evidence reveals that minimal force was used in each incident and that minimal, if any, injury resulted from these incidents. In addition, there is no evidence that any incident occurred involving Mr. Randle and Defendant McKanna in February 2018; and there no evidence that any incident occurred involving Mr. Randle and Defendant Freeman on April 7, 2018.

Although the Court must view the facts in a light most favorable to Mr. Randle at this stage in the proceedings, Mr. Randle "may not merely point to unsupported self-serving allegations, but must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor, without resort to speculation, conjecture, or fantasy." *Reed v. City of St. Charles, Mo.*, 561 F.3d 788, 790–91 (8th Cir. 2009) (internal quotations and citations omitted). "[T]he evidence must be 'such that a

12

reasonable jury could return a verdict for the nonmoving party.'" (*Id.* citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505 (1986).

Here, based on the evidence presented, no reasonable juror could conclude that Defendants Freeman, Cass, Watson, Whitworth, Jenkins, or Newburn used excessive force against Mr. Randle. Rather, the evidence shows that Defendants' conduct was objectively reasonable in each of the incidents at issue. Accordingly, Defendants Freeman, Cass, Watson, Whitworth, Jenkins, and Newburn are entitled to qualified immunity on Mr. Randle's excessive-force claims.

      b.  Failure to Protect Claim

It is well-settled that prison officials have a duty to protect prisoners from violence at the hands of other prisoners. See *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). To establish this constitutional violation, Mr. Randle must prove that his incarceration at the Detention Center posed a substantial risk of serious harm (objective component), and that Defendants actually knew of the risk that he faced, but disregarded that risk (subjective component). *Pagels v. Morrison*, 335 F.3d 736, 740 (8th Cir. 2003); *Jackson v. Everett*, 140 F.3d 1149, 1151 (8th Cir. 1998).

Here, Mr. Randle claims that Defendants Holiday, Mussadiq, Nelson, and McKanna failed to protect him from attacks by Detention Facility staff members. As discussed above, there is no evidence that Detention Facility staff members used excessive force against Mr. Randle. Accordingly, Mr. Randle's continued incarceration at the Detention Facility did not pose a substantial risk of serious harm; and he has not provided any evidence tending to show that any Defendants were aware of a risk of harm

13

to Mr. Randle or any evidence that these Defendants disregarded a risk to Mr. Randle's safety and well-being. Mr. Randle's failure-to-protect claim fails as a matter of law, and these Defendants are entitled to qualified immunity.

D.  Official Capacity Claims

The County Defendants also are entitled to judgment as a matter of law on Mr. Randle's claims against them in their official capacities. The County Defendants are employees of Pulaski County, Arkansas; thus, Mr. Randle's claims against the County Defendants in their official capacities are, in effect, claims against Pulaski County. *Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010). Local governments are not liable under § 1983 for injuries inflicted solely by their employees or agents. *Monell v. New York Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Rather, a county is liable for the acts of its employee only when the employee is carrying out a county policy or custom. *Id.*; *Jenkins v. County of Hennepin, Minn.*, 557 F.3d 628, 632 (8th Cir. 2009).[5] Here, Mr. Randle has not come forward with any evidence to show that he was injured, much less that he was injured as a result of a Pulaski County policy or custom.

---

[5] For purposes of § 1983, a policy is a "deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Marksmeier v. Davie*, 622 F.3d 896, 902 (8th Cir. 2010). To establish a custom, a plaintiff must prove that the county engaged in a continuing pattern of unconstitutional misconduct, not just a single unconstitutional act. *Id.* at 902-903.

## IV.     Conclusion:

The Court recommends that the Defendants' motions for summary judgment (#176, #177) be GRANTED. Mr. Randle's claims should be DISMISSED, with prejudice.

DATED this 9th day of May, 2019.

_____
UNITED STATES MAGISTRATE JUDGE